SINAI D. JOHNSON, Respondent, *v.* DEMAS JOHNSON, Appellant.

1. *Contracts — Marriage by slaves may be validated after emancipation.*— Slaves, in entering into marriage, do a moral act; and although not binding in law, it is no violation of any legal duty; and, as in the case of other parties incapacitated (as minors or insane persons), the contract may be assented to and ratified after the incapacity or disability is removed. It can make no difference that in his earlier days the husband had been already married; his first marriage had no legal existence. He was at liberty to repudiate it at pleasure; and by his continuing to live with his second wife, and acknowledging her as his lawful wife, after he had obtained his civil rights, he disaffirmed his first marriage and ratified his second.

45 595
81a 567
45    595
96a ¹489

*Appeal from St. Louis Circuit Court.*

*H. A. Haeussler* and *J. Wickham*, for appellant.

Marriage being a civil contract, to which the consent of the parties capable in law of contracting is essential, the second pretended marriage of appellant was void. (Anderson v. Poindexter, 6 Ohio St. 622 ; Smith v. The State, 9 Ala. 990–6 ; Howard v. Howard, 6 Jones, 235 ; Malinda v. Gardner, 24 Ala. 719 ; State v. Samuel, 2 Dev. & Bat. 177.) Marriages of slaves are to be deemed null and void. (Bishop on Mar. and Div., ed. 1864, §§ 156–8 ; Stanley v. Nelson, 28 Ala. 514 ; R. C. 1845, ch. 167, p. 1014, § 7 ; Elliott v. Gurr, 2 Phillimore, 16 ; Browning v. Reane, *id*. 69 ; Crump v. Morgan, 3 Ired. Eq. 100 ; Bishop on Mar. and Div., § 139, and cases cited.) Incompetency to contract, on part of one of the parties, will render the marriage void. (Clément v. Mattison, 3 Pick. 93 ; True v. Ranney, 21 N. H. 52 ; Reeve on Dom. Rel. 315, note 1, and cases cited ; 3 Richards' Eq. 263 ; State v. Van Leer, 5 Md. 91 ; Stanbery v. Wilson, 28 Ala. 514 ; Anderson v. Poindexter, 6 Ohio St. 622 ; Howard v. Howard, 6 Jones, N. C., 235 ; Malinda v. Gardner, 24 Ala. 719 ; Smith v. State, 9 Ala. 990 ; State v. Samuel, 2 Dev. & Bat. 177 ; Conn. v. Clements, 6 Burr. 206–11 ; Davis v. Evans, 18 Mo. 249 ; Bishop on Mar. and Div., §§ 46, 201.) As to void common-law marriages, see 2 Kent, 86 ; 1 Mass. 240 ; 7 Mass. 54 ; Mass. Dig. 247–8, etc.

*S. N. Taylor*, for respondent.

The slave marriage of appellant with Elizabeth, while they were slaves, was such a marriage as he could repudiate at any time while remaining a slave. (1 Bishop on Mar. and Div., §§ 157–9, 162 ; Malinda *et al.* v. Gardner, 24 Ala. 719 ; Smith v. The State, 9 Ala. 996.) In 1849 appellant, still being a slave, married respondent, which act was a complete repudiation of his slave marriage with Elizabeth. Appellant constantly lived and cohabited with respondent for the period of thirteen years. His thus living and cohabiting with respondent for so long a period

after his manumission was a legal assent and ratification of his marriage with her, and made it a valid, binding marriage. (1 Bishop on Mar. and Div. 159–163; McReynolds v. State, Law Reg. Oct., 1868, p. 736; Girod v. Lewis, 6 Martin, La., 559; 1 Bishop on Mar. and Div., §§ 140–142; Cole v. Cole, 5 Sneed, 57; 2 Kent's Com. 39; Mrs. Ash's Case, Freeman's Ch. Eng. 269; Wightman v. Wightman, 4 Johns. Ch. 343.) So cohabitation, after reaching the age of consent, is a legal assent and ratification of the marriage of an infant, and subjects the parties to all the liabilities and rights of a valid marriage. (Reeve's Dom. Rel. 355; 1 Bishop on Mar. and Div. 150; Whart. Crim. Law, §§ 26, 28; Aymar v. Roff, 3 Johns. Ch. 49; Tyler on Inf. and Cov. 125, § 81; 1 Blackst. Com. 436; Reeve's Dom. Rel. 236; Allis v. Billings, 6 Metc. 415.)

WAGNER, Judge, delivered the opinion of the court.

The respondent instituted a suit for divorce against the appellant, in the St. Louis Circuit Court, on the ground of cruel and inhuman treatment, and, upon a hearing, a divorce and alimony were decreed. The parties are both negroes, and the appellant was formerly a slave; and the question presented by the record is new in this court, and may be of interest to persons similarly situated.

It seems that Demas, the appellant, was a slave in Virginia, belonging to a Mr. Mason; that whilst he lived there he married a negress, also a slave, by whom he had three children. His wife and children were sold to some person in Texas, and his master took him to Mexico, from whence he was brought to St. Louis. After his arrival in St. Louis, and in the year 1849, he married the respondent, then a free woman of color, and in about one year thereafter he was emancipated by his master. When he obtained his freedom he continued to live and cohabit with the respondent as his wife for about thirteen years, at the expiration of which time she left him, for reasons stated in the petition, and commenced this proceeding for a divorce.

For the appellant it is insisted upon, in argument, that as the marriage took place whilst he was a slave, it was void, and as no

solemnization was had subsequent to his manumission, this suit is not maintainable. In this State marriage is considered a civil contract, to which the consent of the parties capable in law of contracting is essential. In none of the States where slavery lately existed did the municipal law recognize the marriage rites between slaves. They had no civil rights except where the right to freedom was involved, in which case they could prosecute a suit by their next friend to vindicate their claim. They were responsible for their crimes, but unconditional submission to the will of their master was enjoined upon them. By common consent, and universal usage existing among them, they were permitted to select their husbands and wives, and were generally married by preachers of their own race, though sometimes by white ministers. They were known and recognized as husband and wife by their masters and in the community in which they lived; but whatever moral force there may have been in such connections, it is evident there was nothing binding or obligatory in law.

"Marriage," says the court in North Carolina, "is based upon contract; consequently the relation of man and wife can not exist among slaves. It is excluded both on account of their incapacity to contract, and of the paramount right of ownership in them as property." (Howard v. Howard, 6 Jones, N. C., 235, 236.) So, in Alabama, the Supreme Court says : "Persons in that condition are incapable of contracting marriage, because that relation brings with it certain duties and rights with reference to which it is supposed to be entered into. But the duties and rights which are deemed essential to this contract are necessarily incompatible with the nature of slavery, as the one can not be discharged nor the other be recognized without doing violence to the rights of the owner. In other words, the subjects of the contract must cease to be slaves before the incidents inseparable to the relation of marriage, in its proper sense, can attach." (Malinda v. Gardner, 24 Ala. 719, 727.)

Mr. Bishop sums up the substance of the authorities when he says : "It is the present established law, wherever slavery prevails in this country, that the marriages of slaves are to be deemed

null and void." (1 Bishop on Mar. and Div., § 156.) The slaves being denied all civil rights, could they, in a state of slavery, contract marriage so as to be binding upon them after their emancipation? Whilst marriage is a civil contract, and the assent of capable minds is necessary to its validity, still it differs in many particulars from ordinary, general, or commercial contracts.

In speaking on this subject, the Court of Appeals in Kentucky uses the following language: "Marriage, though in one sense a contract—because, being both stipulatory and consensual, it can not be valid without the spontaneous concurrence of two competent minds — is nevertheless *sui generis,* and, unlike ordinary commercial contracts, is *publici juris,* because it establishes fundamental and most important domestic relations. And therefore, as every well-organized society is essentially interested in the existence, and harmony and decorum of all its social relations, marriage, the most elementary and useful of them all, is regulated and controlled by the sovereign power of the State, and can not, like mere contracts, be dissolved by the mutual consent only of contracting parties." (Maguire v. Maguire, 7 Dana, 181; Dickson v. Dickson, 1 Yerg. 110; Duntze v. Levett, 3 Eng. Ec. 360; Sto. on Confl. Laws, §§ 109, 111; 1 Fras. Dom. Rel. 88.)

The common law was changed in this State with reference to marriages, and the whole subject-matter was governed by municipal regulations. But the statutory law was exclusively applicable to free persons, and did not reach those persons who were in a state of slavery when the marriage was contracted. Such being the case, we must look to the common law for our guidance, and decide this question according to its recognized rules, and by the application of analogous principles. Though the slave could make no civil contract, and his marriage was absolutely void in legal contemplation, yet it is apparent there was the moral assent of the mind.

It was a rule of the common law that if a boy under the age of fourteen, or a girl under twelve, marries, the marriage is inchoate and imperfect, and when either of them comes to the

age of consent, they may disagree and declare the marriage void, without any divorce or sentence of the spiritual court; but it is so far a marriage that if, at the age of consent, they agree to continue together, they need not be married again. (1 Sharsw. Blackst. Com. 436.)

The rule is well established that where marriages have been entered into, where one of the parties was laboring under insanity, if the parties continue to cohabit after a lucid interval, the cohabitation will render their marriage good. Shelford remarks: "There is authority for the proposition that a marriage by a *non compos*, when of unsound mind, is rendered valid by consummation during a lucid interval." (Shelf. Mar. and Div. 197.) And it has been held that a lunatic, on regaining his reason, may affirm a marriage celebrated while he was insane, even though a statute had required a particular form of solemnization. (1 Bishop on Mar. and Div., § 140; see also Wightman v. Wightman, 4 Johns. Ch. 343–5.)

We may now apply the foregoing principles to the case at bar. The slave, in entering into marriage, did a moral act; and although not binding in law, it was no violation of any legal duty. If, after the emancipation, there was no confirmation by cohabitation or otherwise, it is obvious there would be no grounds for holding the marriage as subsisting or binding. But, as in the case of other parties incapacitated, we perceive no good reason for holding that the contract may not be assented to and ratified after the incapacity or disability is removed. And in harmony with these views, the Supreme Court of Louisiana have expressly decided that a marriage contracted in a state of slavery may be ratified and become binding by mutual assent and cohabitation after the slaves have attained their freedom. (Girod v. Lewis, 7 Martin, 559.) The court reasoned that it was clear that slaves had no legal capacity to assent to any contract. With the consent of their masters, they might marry, and their moral power to agree to such a contract or connection as that of marriage could not be doubted; but in a state of slavery it could not produce any effect, because slaves were deprived of all civil rights. Emancipation gave to the slave his civil rights, and a contract of

marriage; legal and valid by the consent of the master and moral assent of the slave, from the moment of freedom, although dormant during the slavery, produced all the effects which resulted from such a contract among free persons.

In the very recent case of McReynolds v. The State (5 Coldw. 18), it was held that if, after emancipation, the parties live together as husband and wife, and before emancipation they were married in the form which either usage or law had established for the marriage of slaves, their subsequent mutual acknowledgment of each other as husband and wife should be held to complete the act of matrimony so as to make them lawfully and fully married from the time at which their subsequent living together commenced. I am therefore of the opinion that as the appellant, when he was emancipated, continued to live and cohabit with the respondent and constantly acknowledged her as his wife, the marriage should be recognized and be deemed valid and binding. That in his earlier days he was previously married can make no difference. His first marriage in his then state of servitude had no legal existence; he was at liberty to repudiate it at pleasure; and by his continuing to live with respondent and acknowledging her as his lawful wife after he had obtained his civil rights, he disaffirmed his first marriage and ratified the second.

The provisions of the statute (2 Wagn. Stat. 931, §§ 12–16) which have been referred to, can have no bearing on the case. They were not passed and did not take effect till some time after this suit was instituted. The parties never cohabited together after the above sections became operative, so as to be within the reach of their prohibitions or incur their penalties.

The finding of the court seems to be well borne out by the testimony, and we are not inclined to review it. As to the question of alimony, the decree will not be disturbed on that account. The evidence shows that the appellant's property is valued at between $5,000 and $6,000. The court awarded the respondent $1,000. That is not exorbitant, although in this particular case we should have been satisfied had the sum been less; yet there is nothing in it justifying our interference.

Judgment affirmed. The other judges concur.